**In the Matter of Louis C. OSTRER, Bankrupt.**

**No. 64–B–1052.**

United States District Court, E. D. New York.

Sept. 30, 1970.

Safir, Kahn, Midler & Simon, for Bankrupt, Joseph Lewis Simon, of counsel.

Cole & Deitz, New York City, for Objecting Creditor, Anthony J. D'Auria, New York City, of counsel.

ZAVATT, District Judge.

 Meadow Brook National Bank (Bank), the objecting creditor, moves to confirm the report of Referee William J. Rudin, dated April 6, 1970, which recommended that the specifications of the creditor be sustained and that the bankrupt be denied a discharge in bankruptcy. The bankrupt challenges the findings of fact and conclusions of law contained in the report and also raises some procedural issues concerning delay in the proceedings and the power of this court to re-refer[1] the case to the Referee. The court adopts and confirms the Referee's findings of fact and conclusions of law.

In order to understand the issues raised by the instant motion, it is necessary to recount the history of this protracted litigation. On November 20, 1964, Louis C. Ostrer (hereinafter, bankrupt) filed a voluntary petition in bank-

---

1. Since the petition in bankruptcy is automatically referred to the Referee when it is filed, Rule 2, Bankruptcy Rules of the Eastern District of New York, the term "re-reference" is somewhat of a misnomer in that it implies that the district judge referred the case on two separate occasions. However, for purposes of clarity, the term "re-reference" will be used when referring to the judge's having sent the case to the Referee following the Court of Appeals remand.

Similarly, there may be some confusion regarding the two opinions of the Referee. The first opinion is properly called a "decision," because Referees are empowered to make decisions and corresponding orders in cases that are automatically referred to them under the rules subject, of course, to the review power of the district court. On the other hand, the second opinion, being merely advisory, is properly called a "report." Cf. Schlesinger v. Phillips, 36 F.2d 191 (5th Cir. 1929); Fellows v. Freudenthal, 102 F. 731 (7th Cir. 1900); cf. In re Weldon, 262 F. 828 (N.D.Iowa 1920). It contains only recommendations and the district court must review that report and either adopt it, reject it, or send it back for further findings.

ruptcy and was adjudicated bankrupt on that date. The Bank, a creditor of the bankrupt, filed specifications of objections to the discharge of the bankrupt alleging that the bankrupt had obtained extensions of credit on certain loans from the Bank, by the filing of a false and fraudulent financial statement. See section 14c(3) of the Bankruptcy Act (Act) 11 U.S.C. § 32(c) (3).[2] Extensive hearings were held before the Referee during December 1965 and January 1966. On October 13, 1966, the Referee rendered his decision. He made findings of fact and conclusions of law and ordered that the specifications be dismissed and the bankrupt granted a discharge. The Referee based his decision on the fact that although the statement submitted to the Bank was erroneous in that it listed assets which were not owned by the bankrupt, it had omitted to list assets of greater value which the bankrupt did own. The Referee concluded that the existence of these unlisted or "balancing assets" negated any intention on the part of the bankrupt to deceive the Bank by the delivery of the financial statement and, therefore, did not fall within the ambit of § 14c(3) of the Act.

On motion of the creditor to review the Referee's report, this court, in a memorandum-order dated February 24, 1967, without reviewing the findings of fact, reversed the Referee on the law. I held that intent to deceive was irrelevant under § 14c(3), if the bankrupt had actual knowledge that the submitted statement was incorrect to a material degree, and held that, since it was undisputed that bankrupt had such actual knowledge, the discharge should not have been granted. On April 19, 1968, the Court of Appeals for the Second Circuit (Judge Ryan, dissenting) reversed this court, In re Ostrer, 393 F.2d 646 (1968), holding that a knowingly erroneous statement, which was not delivered with an intent to deceive or defraud bankrupt's creditors, was not "materially false," within the meaning of section 14c(3) of the Act. The Second Circuit did not pass on the Referee's findings regarding the so-called "balancing assets," remanding the case to this court to consider the Referee's findings in that regard.

As of the date of the remand, no court had yet passed upon the findings of fact contained in the Referee's initial decision. Specifically, no court had reviewed his finding that these "balancing assets" existed, a finding that was the *sine qua non* of his conclusion that the statement was submitted with no intent to deceive the Bank. Upon reading the entire file, and upon consideration of the Bank's claims in regard to the "balancing assets," this court was unsatisfied with the Referee's findings and, on April 1, 1969, I re-referred the case to the Referee "for further findings in accordance with the decision of the Court of Appeals * * * *."

At an unspecified date after the re-reference, the parties appeared before the Referee. It does not appear in the record that the bankrupt challenged the propriety of the re-reference when he appeared before the Referee, and it is certain that he made no motion before this court in connection therewith, although bankrupt now claims, almost two years later, that the re-reference was erroneous. In any event, the parties agreed that there was no necessity for further hearings in connection with the re-reference. The Referee, therefore, reconsidered the entire file. In a report, dated April 6, 1970, he found that the "undisputed testimony" in the record indicated that the "balancing assets" were

2. § 32. *Discharges, when granted*
&ast; &ast; &ast; &ast; &ast;

(c) The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) while engaged in business as a sole proprietor, partnership, or as an executive of a corporation, obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation; * * *.

hypothecated to banks for loans and that the equity in said assets was thereby diminished. In addition, the "balancing assets" had been held by bankrupt's brothers-in-law, the Krieglers, and had been co-mingled with similar assets owned by the Krieglers. Therefore, the Referee found that it was impossible to determine what portion of the bankrupt's assets so pledged for the Krieglers' loans might be jeopardized in the event of a default by the Krieglers. The Referee found that the diminished equity in the "balancing assets," did not offset the value of the assets that had been erroneously included in the statement and, consequently, concluded that the statement was intended to deceive the Bank. He, therefore, changed his original findings, recommended that the Bank's specifications be sustained and a discharge be denied.

The bankrupt now challenges the findings in the Referee's report claiming: (1) that there has been a denial of due process because of the delay in the proceedings; (2) that the court was without power to re-refer the case to the Referee for report and the Referee was without power to change his findings; (3) that since the Referee relied on an incorrect economic theory in reaching his conclusions regarding the "balancing assets," his subsequent findings as to intent are erroneous.

I The claim that due process was denied to bankrupt because of delay in the proceedings.

Bankrupt argues that he was denied due process because of delay in this case which started with the filing of his petition in 1964. The court need not even consider the period predating the Court of Appeals remand in April 1968, since the bankrupt, himself, appealed to that court. As regards the two-year period since the remand, the court does not find that delay "inordinate," nor does it find that the scheme of the Bankruptcy Act has been defeated by said delay. The Court of Appeals remand indicated that the factual findings of the Referee were to be challenged for the first time on the remand. This court, as explained *infra,* was well within its power when it, in turn, re-referred the case to the Referee to hear and report. The year in which he held the case was not unreasonable, particularly since the file was voluminous and he changed his findings of fact and conclusions of law. This court is particularly unimpressed with bankrupt's claim of delay in light of the fact that he never objected to the re-reference at any time prior to the Referee's report. Now, he not only claims that the re-reference to hear and report was in excess of this court's power, but also claims that he was prejudiced by the delay inherent in that re-reference. The conclusion is inescapable that bankrupt delayed asserting his claim of due process denial until the Referee changed his findings and recommended a denial of discharge. Furthermore, bankrupt cites no authority whatever for his claim that delay in bankruptcy proceedings may constitute a denial of due process. The court holds that the delay was not inordinate and, further, that bankrupt waived any right to contest the delay by not raising that claim until after the Referee had already made his report.

II Was the re-reference in excess of this court's powers?

Bankrupt argues (again, with no supporting authority) that this court lacked the power to send the case back to the Referee following the remand by the Court of Appeals. Bankrupt argues that section 38 of the Act (11 U.S.C. § 66) which sets forth the jurisdiction of referees does not include hearing a case after a remand from the Court of Appeals. Since the Referee had no power to hear the case, he argues, *a fortiori,* he had no power to make new findings. Bankrupt also argues that the remand from the Second Circuit did not contemplate new findings but only that the district court was to review the original findings. In effect, the argument amounts to nothing more than the bare assertion that this court, as well as the Referee, was bound by the original find-

ings and that the Referee was not entitled to make, nor this court entitled to consider, new findings. 11 U.S.C. § 11(a) (10) provides that courts of bankruptcy are invested with jurisdiction to:

Consider records, findings, and orders certified to the judges by referees, and confirm, modify, or reverse such findings and orders, *or return such records with instructions for further proceedings* (emphasis added);

11 U.S.C. § 66, concerning jurisdiction of referees provides:

Referees are hereby invested, subject always to a review by the judge, with jurisdiction to (1) consider all petitions referred to them and make the adjudications or dismiss the petitions;

General Order in Bankruptcy 47 provides:

Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous. The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

A literal reading of these sections supports the court's power to re-refer the case to the Referee, and the cases that have passed on the question of the ambit of 11 U.S.C. § 11(a) (10) have held that it means what it says, and have accorded it a liberal construction. Miami National Bank v. Stavros, 378 F.2d 939 (5th Cir. 1967) [upholding district judge who had referred the same case twice to the Referee after the initial reference]; *cf.* In re Terrace Superette, Inc., 229 F.Supp. 371 (W.D.Wis.1964) [In remanding case to Referee for further findings, "This Court, with its power of review over the Referee and the proceedings had before the Referee can direct the Referee to take such action * * * as the Court deems appropriate."]; *cf.* In re Smith, 205 F.Supp. 27, 29 (E.D.Pa. 1962); In re Klein, 114 F.Supp. 291 (W.

D.Ky.1953). *Klein, supra,* is factually analogous to our case. There, the seller claimed that bankrupt contracted for equipment by making false representations as to his financial condition and also claimed that title to the property had not yet passed to the bankrupt. The Referee found no misrepresentations but upheld the claim that title had not yet passed. Upon review, the district judge re-referred the case to the Referee, who, after holding further hearings, reversed his prior decision. The district court made short shrift of seller's argument regarding the power of the Referee to change his order:

[Seller] * * * questions the right of the referee to change his order * * *. I do not think there could be any serious question but that the court had a right to rerefer this case to the referee for further proof upon a showing that such proof was to the proper determination of the rights of the creditors. * * * 114 F.Supp. at 293.

If this court had the power to re-refer the case to the Referee, it goes without saying that the Referee had the power to change his opinion upon a consideration of new evidence or, as here, upon a reconsideration of the evidence before him. If this were not so, re-reference would be a meaningless procedure. In, In re Clark, 257 F.Supp. 761 (E.D.Va.1966), the court held that:

The Referee has the same power to reconsider his own orders as that possessed by the District Judge, In re Pottasch Bros., Inc., 2 Cir., 79 F.2d 613, * * * a court of bankruptcy is always open to reconsider the merits of its own orders until there has been a distribution of the funds in controversy. 257 F.Supp. at 763.

Similarly, it was held in In re Smith, *supra,* that:

* * * Whether a prior order should be re-examined, and, if re-examined, whether it should be vacated or modified is normally a matter of sound discretion with the referee or district

judge as the case may be * * *. 205 F.Supp. at 29.

*See also Klein, supra*; 7 Moore's Federal Practice, 211; *cf*. In re Plotkin, 247 F.Supp. 293 (S.D.N.Y.1965).

■ Since this court clearly would have been empowered to re-refer the case to the Referee, and the Referee empowered to change his order, if there had been no intervening appeal to the Court of Appeals, the sole question is whether that appeal and subsequent remand should affect these powers. The court can perceive no valid reason why it should. Neither this court nor the Second Circuit even considered the Referee's findings of fact because only questions of law were in dispute on that appeal. The Second Circuit expressly said as much when it remanded the case to allow the Bank to challenge the Referee's findings as to "balancing assets." Therefore, when the case was remanded to this court, it was in essentially the same posture as it was when it came here from the Referee after the initial reference. As discussed, *supra*, the law is clear that at this initial juncture this court had full power to re-refer the case for further findings of fact, and the intervening appeal on the law should in no way limit that power. The court holds that the intervening appeal on the question of law is totally irrelevant to the exercise of these powers; that this court did not exceed its inherent or statutory authority when it re-referred the case to the Referee, and that the Referee was entitled to change his findings on the re-reference.

■ The court also notes that it was not until after the Referee changed his findings in his report that the bankrupt asserted that the Referee had no power to reconsider the case. This court fails to perceive any valid reason whatever for the failure of the bankrupt to raise the issue of this court's, as well as the Referee's power after the remand, at any time prior to the rendering of his report. Bankrupt argues that the case was re-referred to the Referee without his knowledge or consent. However, it is undisputed that the parties appeared before him sometime after the re-reference, at which time they agreed that no further evidence would be necessary in order for the Referee to comply with this court's re-reference. Therefore, bankrupt was on notice at that point that (1) the case had been re-referred and (2) that the Referee was to reconsider his original findings and make a report. Bankrupt also knew full well that if the Referee were to reconsider the case and report, the possibility existed that he would recommend different findings. Bankrupt, however, seems to suggest that because no new evidence was adduced the Referee was bound by his former findings. The mere suggestion is insidious in light of the fact that the parties themselves agreed to stand on the original record. Bankrupt is arguing, in so many words, that once the parties agreed to stand on the record, the Referee was bound by his original findings, lest he become a reviewing court of himself. Bankrupt neglects to state the converse of the proposition which is that if the Referee could do no more than accept his former findings, he was no more than a rubber stamp. The long and short of this claim is that once the bankrupt knew that the case had been re-referred he should have made any objections to the propriety of that procedure. Were it not for the prior finding that the court was well within its powers when it ordered the re-reference, the court would find that the bankrupt waived any right to make such a claim at this late date.

## III The Referee's findings and recommendations

Having considered and rejected the bankrupt's procedural objections, the court now turns to the Referee's recommended findings of fact and conclusions of law. The Referee found in his report that the statement which bankrupt submitted to the Bank was not only erroneous but also that it was sub-

mitted with intent to deceive the Bank. In both the decision and the report he found that bankrupt included in his statement assets which he did not own, and omitted assets which he did own. In his decision, the Referee found that the existence of these undisclosed assets negated any intent by bankrupt to deceive the Bank. However, upon reconsideration of the uncontradicted evidence in the record, he found that the unlisted assets were burdened with charges and pledged for loans, thus diminishing bankrupt's equity in these assets. Having found that the unlisted assets did not balance those incorrectly listed, he concluded that the statement was intended to deceive the Bank. The basic thrust of bankrupt's argument in challenging these findings is directed at the economic theory relied upon by the Referee in reaching his conclusion. Therefore, before considering the findings, a discussion of the theory of "balancing assets" is in order.

We start with the proposition that before a creditor loans money he wants an accurate picture of the financial condition of the potential debtor. In fact, the Bankruptcy Act, § 14c(3) places an obligation on the debtor to truthfully report his financial condition in any statement he makes to a creditor. It may also be assumed that, generally, a creditor will be more reluctant to lend money as the debtor's ratio of assets to liabilities decreases or, conversely, the greater the ratio of assets to liabilities the better the financial condition of the debtor and the more likely that he can obtain credit. From these premises, it follows that if a debtor intended to deceive a creditor, he would do so by either overstating his assets or understating his liabilities, or both. In any of these situations, the ratio would be increased in favor of the debtor. On the other hand, a debtor presumably would have nothing to gain by omitting to include assets which he legitimately owns. Between these obvious extremes there is a middle ground: a debtor, who omits to state a liability but who also fails to state corresponding asset, may not have intended to deceive a creditor on the implied theory that the failure to include a liability (presumably beneficial in obtaining credit) is offset by the failure to include an asset (presumably detrimental in obtaining credit).[3] See e. g., In re Keller, 86 F.2d 90 (2d Cir. 1936); In re Kerner, 250 F. 993 (2d Cir. 1918), reversing Judge Learned Hand in 245 F. 807 (S.D.N.Y.1917); In re Reed, 256 F. 412 (N.D.Ga.1919); In re Maaget, 245 F. 804 (S.D.N.Y.1911) [Judge Learned Hand]. The law, however, is unresolved on this question and, as the Keller case notes, the existence of "balancing assets" may not necessarily cure an erroneous financial statement, compare Maaget and Reed, supra, with Kerner, supra. The Court of Appeals specifically declined to consider that issue in the instant case. 393 F.2d 649, 650.

The above analysis and cited cases deal only with the asset/liability ratio. However, this ratio does not exhaust the spectrum of possible creditor considerations. For instance, a creditor might be equally interested in the type of assets owned by a debtor as he would be with the asset/liability ratio. To state an obvious example: a creditor would rather have, as collateral for a loan, a $100,000 savings account than $100,000 in stock certificates in a declining market. Thus, the type of assets owned by the debtor is an important consideration, and one which differentiates the instant case from those discussed above. Specifically, the court must pass on the Referee's ultimate

---

3. This is not to say that the omission of both an asset and a corresponding liability will not affect the ratio. In such an instance, however, degree is important. In the usual case the omission of corresponding assets and liabilities will not materially affect the ratio; or, stated in another way, will affect it much less than if only an asset were erroneously included or only a liability erroneously excluded.

conclusion that ownership of other assets does not, on the facts of this case, negate an inference that a knowingly erroneous statement was submitted with intent to deceive the creditor.

### Referee's Findings of Fact

The Referee found that bankrupt was engaged in the business of selling life insurance as a broker, both in his own name and as a general agent, under the name of Louis C. Ostrer Associates, Inc., and that he was also an executive of Citizens Factors Corporation, a money lending business. Bankrupt was the sole stockholder of both corporations. Between the period November 16, 1960–February 8, 1962, he obtained in excess of $350,000 as extensions or renewals of credit from the Bank. On May 8, 1961, he signed a personal balance sheet (statement) which had been prepared by his accountant, Ben Wolf, a Certified Public Accountant. This statement was delivered to the Bank at the request of Mr. Haggett, the vice-president in charge of a branch of that Bank. It listed a net worth of over one million dollars but was erroneous in the following respects:

1. It listed as an asset a 1960 Mercury station wagon which was registered in the name of bankrupt's wife;

2. It listed as a personal asset $150,000 in agency insurance renewal commissions, which were actually payable to the corporation (Louis C. Ostrer Associates, Inc.) and not to the bankrupt;

3. It listed as an asset a burglary claim of $20,000 which was settled subsequently for $9,500. Included in this claim was property which belonged to bankrupt's wife;

4. It neglected to state as a contingent liability a note payable to the bankrupt, endorsed by him, and discounted by the objector-Bank. The statement did not include that note as an asset nor was the contingent liability thereon listed as a debt. It is to be noted, however, that this note was held by the Bank, the objecting creditor, which is charged with notice thereof;

5. It listed as an asset a home in Great Neck, New York, (value $90,300) which was the sole property of the bankrupt's wife;

6. The statement failed to list assets which were owned by bankrupt and were being held by his brothers-in-law in their names, to wit:

| | | Approx. Value |
|----|-------------------------------------------|---------------|
| a. | 4,100 shares of Russ Togs stock | $200,000 |
| b. | 500 shares Diebold stock | 25,000 |
| c. | proceeds of sale of Chock Full O'Nuts stock | 12,000 |
| d. | 1,000 shares Sessions Clock stock | 10,000 |
| e. | proceeds of sale of Major Realty stock | 13,000 |

These facts were found by the Referee in both the decision and the report and the factual findings in this regard are not challenged, except as to the value of the renewal premiums due to the bankrupt's corporation. In the decision, however, the Referee merely added together the value of the unlisted securities (approximately $260,000) and concluded that this value was approximately $20,000 in excess of the incorrectly listed assets (approximately $240,000). Additionally, he noted that the statement was only an approximation; that $423,500 in personal renewal premiums (another asset in the statement) was understated; that the $150,000 in corporate renewals was listed separately on the statement (thus evidencing no intent to deceive the Bank into believing that they were his) and, further,

that he placed no value on the renewals owed to the corporation of which the bankrupt was the sole shareholder. These other considerations *coupled* with the fact that assets of greater value were not included, led the Referee to conclude in his decision that the statement was not submitted with intent to deceive the Bank.

In the report, the Referee found that three of the five securities which he had previously found to be "balancing assets" were burdened with charges as follows:

a. The Russ Togs stock (4,100 shares owned by bankrupt) was held for him by the Krieglers as part of 12,000 shares in their name. These shares had been pledged by the Krieglers as collateral for loans of approximately $246,000. (See findings of fact 14.)

b. The 500 shares of Diebold stock, also held by the Krieglers as part of 1,700 shares, had all been hypothecated to the Swiss Credit Bank for a loan of $90,500 to the Krieglers. The Swiss Bank also held 200 shares of New England Line (value unstated) as collateral for that loan.

c. The proceeds of the sale of the 3,000 shares of Major Realty stock which were owed to the bankrupt were not payable until the bankrupt paid the stockbroker the purchaser price of the stock.

There appears to be no dispute that the Sessions Clock and Chock Full O'Nuts stock were owned by the bankrupt, and not pledged for loans or otherwise burdened.

On the basis of this evidence, the Referee found that the hypothecation of these unlisted assets (Russ Togs and Diebold) for substantial loans decreased bankrupt's equity therein. He also found that the stocks claimed to be owned by bankrupt, but held by the Krieglers, were co-mingled with their stock, thus making it "impossible to determine what portion of the loans is applicable to stock belonging to the bankrupt * * *" He stated:

The original finding that the bankrupt had "balancing assets" tended to negate an intention to deceive the objectant. This re-examination of the evidence relating to these assets required new findings that their net value did not offset the aggregate of the assets stated in the financial statement which were not owned by the bankrupt.

He concluded that the statement had been submitted with intent to deceive the Bank and recommended that the discharge be denied.

Bankrupt challenges the findings of the Referee claiming that he proceeded on an incorrect economic theory. He contends that the unlisted securities, although pledged by the Krieglers, were still owned by the bankrupt; that, in any event, these securities were not pledged for their full value; that the value of bankrupt's securities was over and above the amount of the pledge; that, therefore, the bankrupt should be credited with full equity in his pledged shares, concluding that the securities should be considered as "balancing assets." In short, he argues that the Referee's conclusion that "balancing assets" did not exist was erroneous and that if he had correctly decided that they existed he would have concluded that the bankrupt did not intend to deceive the Bank.

The court expressly notes, before considering bankrupt's legal arguments, that his attorney stated in open court that he would introduce irrefutable evidence that it was the custom in the marketplace for creditors to consider pledged shares as not diminishing debtor's equity therein. Neither this evidence nor the promised affidavits have ever been submitted to this court, leading to the inescapable conclusion that either his attorney forgot his promise or, more likely, that such a proposition is untrue.

Bankrupt invokes the doctrines of resultant, express and constructive trusts to bolster his argument that bankrupt was the owner of the shares. He also cites authority concerning the rights of a party whose securities have been wrongfully pledged. However, none of these doctrines is relevant to the issues in this case and, in fact, serve to obfuscate, rather than clarify, the real issues.

The doctrine of trusts (of whatever kind) is irrelevant because the dispute is not whether the Krieglers or bankrupt *owned* the stock. The dispute is whether a creditor would have been concerned with the fact that the securities were pledged in deciding whether to extend credit to the debtor and, if so, whether the failure to list these assets (while listing other assets of equal dollar value) evidences an intent to deceive the creditor.

Bankrupt asks this court to accept dollar values of assets as the sole factor in a creditor's decision to lend money but, as shown, *supra*, some assets are more desirable from a creditor's point of view than others. One need look no further than to the facts of the instant case to understand the validity of this proposition. When a creditor investigates the financial condition of a potential debtor, he does so for the purpose of ascertaining what risks are involved in the loan. Specifically, he wants to know whether the debtor has other assets which can be reached should there be a default. When these assets may be reached is also important to him. Assume that Ostrer owned the house and corporate renewals which were incorrectly listed. Assume, also, that he defaulted in his repayments. In such a case, the Bank could have reached these assets immediately because they were owned outright and were not burdened with other charges. On the other hand, assume that Ostrer had correctly listed the securities and the fact of their pledge. Can it be said that the creditor would have been un-impressed with this fact? If Ostrer had defaulted, the Bank could not have looked to these securities for immediate satisfaction of the debt because they were in the physical possession of a bona fide purchaser. Therefore, the Bank would have to wait until, if ever, the Krieglers repaid their loans before the collateral would be returned to them and, then, Ostrer's shares returned to him. In this setting, it cannot be said that the equity in the pledged securities was equal to the equity in the erroneously listed assets.

■ Bankrupt also proceeds on the assumption that the stocks were wrongfully pledged by the Krieglers. This proposition not only is unsupported by the evidence but also cuts against bankrupt's position. To begin with, there was no evidence to support the fact that the Krieglers wrongfully pledged the shares. Bankrupt asks the court to assume this proposition, when, in fact, he should have proved this point, if, as he claims, it is relevant to his defense of lack of intention to deceive. Furthermore, even if the assets were wrongfully pledged, the undisputed testimony (as well as the brief of the bankrupt) indicate that they were pledged to bona fide purchasers who, because they had given value therefor, were entitled to look to those assets for satisfaction of the Krieglers' indebtedness. In addition, if the creditor knew of the pledge, or even the fact that the shares were being held by another, he would have wanted information about it. Indeed, as bankrupt's brief so adequately points out, the law books are filled with cases of one person's property being held by another without a written agreement, and the subsequent disputes that so often arise as to who is the real owner of the stock. If the Krieglers claimed to own the stock, or had wrongfully pledged it (as bankrupt assumes), a law suit to determine this issue would have preceded any distribution of the funds. Would a creditor have been disinterested in this possibility?

This is not to say that every creditor would have been interested in such information, but, at the least, any diligent creditor would want to know whether assets could be reached immediately, whether there was any dispute regarding their ownership, and whether they had been wrongfully pledged. The mere fact that bankrupt was the true owner and that *some day* the stocks would have been returned to him (bankrupt's position) does not take into account these other highly relevant creditor considerations.

In this light, the court can readily understand the Referee's changed conclusion. In his decision he assumed that the unlisted assets were equally desirable from a creditor's viewpoint to those that were listed. Because of this, he could not understand what bankrupt had to gain by listing the incorrect assets and, consequently, found that bankrupt did not intend to deceive the Bank. However, once he determined that the assets which were not listed were not as desirable as those which were included he found a motive for their omission from the statement. This court is in full agreement with that conclusion and finds it justified by the uncontradicted evidence in the record as well as common sense in commercial transactions.

Having reached this conclusion, the court finds it unnecessary to pass on the $13,000 claim relating to the Major Realty stock or to value the renewals owed to the corporation which was owned by the bankrupt. If the bankrupt claimed full personal value for these assets, he should have submitted appropriate evidence of the corporation's financial condition to the Referee so that the latter could have properly valued that item.

The motion to confirm the Referee's report is granted. The bankrupt is denied a discharge.

This is an order.